## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Michael Nannis,

     Plaintiff

v.

SB Gaming, LLC, et al.,

     Defendants

Case No.: 2:19-cv-01894-JAD-NJK

**Order Denying Motions for Partial Summary Judgment and for Leave to File Exhibit Under Seal**

[ECF Nos. 39, 41]

     Plaintiff Michael Nannis sues a Las Vegas casino and several of its private security officers over an incident in which he was tackled and detained because he was overheard making purported threats of violence.  Nannis moves for summary judgment on his false-imprisonment, battery, and § 1983 claims, arguing that the casino and its security supervisor lacked cause both to initially detain him and to continue detaining him after the alleged threat dissipated.  He also seeks leave to file an excerpt of the casino's security manual under seal.  Because Nannis hasn't established that the defendants were acting under color of state law, I deny summary judgment on his § 1983 claim; I deny summary judgment on his false-imprisonment and battery claims because there remain genuine disputes of material facts.  And I deny the request to seal the security-manual excerpt because there are no compelling reasons to do so.

## Background[1]

     On April 1, 2018, Nannis was playing blackjack at the SLS Las Vegas Hotel and Casino.[2] While playing, he talked to SLS pit-floor supervisor James Pricer about guns, telling a story about an incident that happened in his hometown involving a man who carried a large, concealed

---

[1] The facts are undisputed unless otherwise noted.

[2] ECF No. 1-3 at ¶ 7.

weapon.[3]  Nannis demonstrated with his hands how the man in the story handled the gun.[4]  An SLS employee, Alexander Ferrari, overheard Nannis say, "[I]f I want to, I can blow you guys up in seconds."[5]  Fearing for his safety and that of the public, Ferrari reported the conversation up the chain of command, which eventually led to SLS's security officers approaching Nannis on the casino floor.[6]  Security supervisor Stan Williams was the first to approach Nannis and, as he approached, Williams believed that Nannis was reaching for a weapon in his waistband.[7]  Williams also heard Nannis say "If I could, I would shoot you."[8]  Believing that he was about to be attacked, Williams tackled Nannis to the ground at 8:47 am, assisted by four SLS security officers (Defendants Larry Gilbert, Sori Muletta, and Robert Van der Hartt and one non-party).[9]

The security officers patted down Nannis and found no weapons.[10]  They then placed Nannis in handcuffs and escorted him to a holding room in the casino.[11]  There, the defendants searched Nannis a second time and again found no weapons.[12]  While detaining a handcuffed Nannis in the holding room, the defendants investigated to ensure that Nannis did not pose a threat, including collecting statements from Pricer and Ferrari and searching the hotel room

---

[3] ECF No. 39 at ¶¶ 4–5; ECF No. 39-1 at 30.

[4] ECF No. 39 at ¶ 5; ECF No. 39-1 at 30.

[5] ECF No. 39-1 at 32 (internal quotation marks omitted).

[6] *Id.* at 32, 34.

[7] ECF No. 47-1 at 3.

[8] *Id.*

[9] *Id.* at 3–4.

[10] *Id.* at 4.

[11] ECF No. 39 at ¶¶ 14–15.

[12] *Id.* at ¶ 16.

assigned to Nannis.[13]  Pricer's statement indicated that he never felt threatened by Nannis,[14] and the search of the hotel room yielded no weapons or personal belongings at all.[15]  But it is unclear on this record when Williams learned of Pricer's statement[16] or when the room was searched.[17]

The defendants told Nannis that officers from the Las Vegas Metropolitan Police Department (Metro) had been called to the scene.  Nannis also requested Metro's involvement, as he believed he was being unlawfully detained.[18]  Throughout his detention, Nannis expressed that he didn't understand why he was being held, and he repeatedly requested that the defendants talk to Pricer to clear up the misunderstanding.[19]  Nannis also continually protested that the handcuffs were too tight.[20]  At 9:10 a.m., Williams read a trespass warning to Nannis, forbidding him from re-entering SLS property in the future.[21]  Two Metro officers, Cody Bunn and Mitchell Neddo, arrived at 9:26 a.m. and began talking to the defendants and Nannis.[22]  Officer Neddo removed SLS's handcuffs from Nannis and replaced them with a pair of Metro handcuffs.[23]  After confirming that the defendants only wanted to trespass Nannis from the property, the

---

[13] *Id.* at ¶ 17; ECF No. 47-1 at 4–5, 8.  It is disputed whether Nannis had checked in to a room at the SLS or whether he had merely been given a complimentary room that he did not intend to use.

[14] ECF No. 39-1 at 30.

[15] ECF No. 47-1 at 8.

[16] ECF No. 39-1 at 22–24.

[17] ECF No. 47-1 at 8.

[18] ECF No. 39-1 at 4–5, 7; ECF No. 40 at 9:09 (video exhibit).

[19] *See, e.g.*, ECF No. 40 at 8:55, 9:11, 9:28 (video from security camera in holding room).

[20] *See, e.g.*, *id.* at 9:10, 9:12.

[21] ECF No. 39 at ¶¶ 18–19; ECF No. 40 at 9:10–11.

[22] ECF No. 47-1 at 5.

[23] ECF No. 39 at ¶ 25; ECF No. 47-1 at 5.

Metro officers removed their handcuffs and escorted Nannis off SLS property at approximately 9:39 a.m.[24]

### Discussion

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[25]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[26]  When the plaintiff bears the burden of proof at trial "[he] must come forward with evidence [that] would entitle [him] to a directed verdict if the evidence went uncontroverted at trial."[27]  The plaintiff must establish "beyond controversy every essential element of [his]" claim in order to avoid trial and prevail on summary judgment.[28]

### I.      Nannis's evidentiary objections

Nannis objects to two of the defendants' declarations and urges me to disregard them.[29] He first contends that they are undated, violating the requirements of 28 U.S.C. § 1746.  And he asserts that the declarations contain hearsay statements and improper legal conclusions that I shouldn't consider.  Finally, he objects to Williams's declaration as a sham, arguing that the defendants are using this declaration to create disputes of material fact in order to avoid summary judgment.  Because the declarations substantially comply with the statutory

---

[24] ECF No. 39 at ¶ 30; ECF No. 40 at 9:37–39.

[25] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[26] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[27] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (cleaned up).

[28] *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

[29] ECF No. 49 at 4–10.

requirements, meet the appropriate standards for consideration at this stage, and don't contain contradictions, I overrule Nannis's objections.

### 1. *Undated declarations*

Under penalty of perjury, Williams[30] and Van der Hartt[31] signed declarations, which the defendants attached to their response brief.  Nannis urges me to disregard these declarations because they are undated and thus fail to meet the requirements of 28 U.S.C. § 1746.[32]  The Ninth Circuit has not directly addressed whether courts may consider undated declarations.  But it has held that signing such a document "under penalty of perjury that the contents [a]re true and correct" is sufficient to substantially comply with the statute, even when the form is not perfect.[33]

It appears that the declarations attached to the defendants' response are identical to the ones they attached to their opposition brief in the state-court case—which were also undated.[34] Generally, dates on declarations matter "because a statement may be true if made on one date but perjurious if made on another."[35]  The statements in these declarations don't run that risk because they attest to events in the past exclusively.  And following the Ninth Circuit's limited guidance on this issue, I find that because Williams's and Van der Hartt's declarations were both signed under penalty of perjury, they substantially comply with § 1746.[36]  I therefore consider them in resolving Nannis's motion for partial summary judgment.

---

[30] ECF No. 47-1 at 3–5.

[31] *Id.* at 7–8.

[32] ECF No. 49 at 4–5.

[33] *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995).

[34] *Compare* ECF No. 47-1 at 3–5 *with* ECF No. 1-3 at 20–22; *compare* ECF No. 47-1 at 7–8 *with* ECF No. 1-3 at 24–25.

[35] *E.E.O.C. v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 639 (N.D. Ill. 1988).

[36] The Sixth Circuit has addressed this issue, finding that "the absence of a date on such documents does not render them invalid if extrinsic evidence could demonstrate the period when

### 2. *Hearsay and legal conclusions*

Nannis next argues that I should disregard these declarations because they are based on inadmissible hearsay and contain "inappropriate legal conclusions."[37]  But Nannis relies on outdated summary-judgment standards to make this point, asserting that the declarations are not admissible and may not be considered at the summary-judgement stage.[38]  The 2010 amendment to Federal Rule of Civil Procedure 56 "eliminate[d] the unequivocal requirement" that evidence must be admissible in its present *form* in order to be considered at summary judgment.[39]  Instead, the rule mandates that the *substance* of the proffered evidence be admissible at trial.[40]  Offering a preview of testimony via affidavit is now the standard method for satisfying the rule.

Nannis also takes issue with the portions of these declarations that refer to the written statements of the dealer who reported Nannis's purported threats, Alexander Ferrari; pit-floor supervisor Matthew Barros; casino manager Steve Mills; and the pit-floor supervisor with whom Nannis spoke about guns, James Pricer.[41]  There is little doubt that the defendants would either call those witnesses to testify during trial or would introduce their written statements into evidence.[42]  The defendants have therefore met their burden of demonstrating that the substance

---

the document was signed."  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (citing *World's Finest Chocolate, Inc.*, 701 F. Supp. at 639).  Under that approach, the state-court filings could be used as extrinsic evidence to determine the period when Williams and Van der Hartt signed their declarations.

[37] ECF No. 49 at 4–6.

[38] ECF No. 39 at 9 (citing Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002)).

[39] *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) (unpublished).

[40] *Id.*; *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment.

[41] *Compare* ECF No. 47-1 at 4–5 *with* ECF No. 47-1 at 7–8.

[42] Indeed, Nannis has already filed several of the statements with the court.  *See* ECF No. 39-1 at 30 (Pricer's statement), 32 (Ferrari's statement), 34 (Barros's statement).

of the declarations would be admissible at trial.  So I overrule Nannis's hearsay objection and decline to disregard the two declarations on that basis.

### 3.     *Sham-affidavit rule*

Finally, Nannis objects that Williams's declaration contradicts his deposition testimony at least four times and should therefore be stricken as a sham.[43]  He contends that Williams provides a "new litany of rationales" behind his decision to apprehend Nannis and that Williams is "adding to the background" of his decisions by providing additional information about prior threats SLS faced.[44]  He also asserts that the defendants are attempting to create a genuine issue of material fact about SLS's security policy through Williams's allegedly contradictory testimonies.[45]

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."[46]  But this rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment."[47]  "In order to trigger the sham[-]affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."[48]  "[N]ewly-remembered facts,

---

[43] ECF No. 49 at 7–10.

[44] *Id.* at 7–8.

[45] *Id.* at 7.

[46] *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (cleaned up).

[47] *Id.* (cleaned up).

[48] *Id.* (cleaned up).

or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham."[49]

Nothing in Williams's deposition testimony is clearly and unambiguously contradicted by his declaration.[50]  While he may have added further explanation and background, he did not directly contradict anything.  For example, Nannis argues that Williams declares that he "was the victim of a purported assault by" Nannis but that "Williams never mentioned any assault on him" in his deposition testimony.[51]  But that testimony to which Nannis cites clearly shows that Williams believed Nannis had committed assault against "[e]verybody," including "[e]mployees."[52]  The court can infer that if Williams believed Nannis was assaulting everybody, including employees, that included Williams himself, an SLS employee who was in Nannis's vicinity when the alleged assault occurred.  So in examining the purported inconsistencies, I find that Williams's deposition testimony and declaration are not contradictory.  I therefore overrule Nannis's objection that Williams's declaration is a sham.

**II.  Nannis has not established that the defendants acted under color of state law, so he is not entitled to summary judgment on his § 1983 claim.**

Attempting to confer § 1983 liability on the defendants, Nannis argues that they conspired with Metro to violate his constitutional rights by involving Metro to "trespass" him from the property.[53]  This claim is based not on Nannis's initial takedown but on his "continued

---

[49] *Yeager*, 693 F.3d at 1081 (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07 (1999)).

[50] *Compare* ECF No. 47-1 at 3–5 *with* ECF No. 39-1 at 11–28.

[51] ECF No. 49 at 9.

[52] *Id.*

[53] ECF No. 39 at 17.

detention"[54] after "the [d]efendants had determined that they would not seek [his] arrest."[55] "To state a claim under § 1983, the plaintiff must allege a violation of his constitutional rights and show that the defendant's actions were taken under color of state law."[56] "A defendant acts under color of law if he 'exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[57] Typically, only public agencies and officers act "under color of state law," but private individuals can be liable under § 1983 in certain circumstances,[58] like if "there is such a close nexus between the [s]tate and the challenged action that seemingly private behavior may be fairly treated as that of the [s]tate itself."[59] And "if the state knowingly accepts the benefits derived from unconstitutional behavior, . . . then the conduct can be treated as state action."[60]

Courts use many tests to determine if a private actor acted under color of state law, but Nannis relies only on the joint-action test.[61] "To be engaged in joint action, a private party must be a 'willful participant' with the [s]tate or its agents in an activity which deprives others of constitutional rights."[62] To satisfy the test, Nannis must show that the defendants' actions were substantially and "'inextricably intertwined' with those of the government" or that a conspiracy

---

[54] ECF No. 1-3 at ¶ 69.

[55] *Id.* at ¶ 57.

[56] *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001).

[57] *Perez-Morciglio v. Las Vegas Metro. Police Dep't*, 820 F. Supp. 2d 1100, 1106 (D. Nev. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988) (alterations omitted)).

[58] *Id.* (quoting *Taylor v. First Wyo. Bank, N.A.*, 707 F.2d 388, 389 (9th Cir. 1983)).

[59] *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (cleaned up).

[60] *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (cleaned up).

[61] ECF No. 39 at 16–18.

[62] *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1211 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Aug. 23, 2002) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

to violate his constitutional rights exists.[63]  "If a plaintiff can show the police condoned a private

party's activity that the police knew to be illegal, a question of fact will exist as to whether the

private party and the state actors acted jointly."[64]  "Alternatively, if the plaintiff can show the

police substantially cooperated with the private actor on multiple occasions, that may suffice to

support state action."[65]  But "merely complaining to the police or the police standing by to keep

the peace do not amount to joint action."[66]

The Ninth Circuit's application of the joint-action test in *Tsao v. Desert Palace, Inc.*

shows why it's not met here.  In *Tsao*, the panel held that the casino defendant was liable for

§ 1983 violations because of the "system of cooperation and interdependence" that existed

between the casino and the police via the summons-in-lieu-of-arrest (SILA) program.[67]  Through

that program, the casino's private security guards received training directly from the police, after

which the guards would "have the authority to issue citations that compel individuals to appear

in a particular Nevada Justice Court at a specified date and time, thereby performing a law

enforcement function."[68]  The Ninth Circuit held that because some casino guards had "the

authority, normally reserved to the state, to issue a citation to appear in court";[69] the SILA

program conferred benefits upon both the casino and the police;[70] and a guard in *Tsao* relied on

---

[63] *Id.*; *Perez-Morciglio*, 820 F. Supp. 2d at 1108.

[64] *Perez-Morciglio*, 820 F. Supp. 2d at 1108 (citations omitted).

[65] *Id.* (citation omitted).

[66] *Id.* (quoting *Peng v. Mei Chin Penghu*, 335 F.3d 970, 980 (9th Cir. 2003) ("A 'single request to the police, without more, [is] not sufficient to establish a claim against a private actor pursuant to § 1983.'")) (citing *Collins v. Womancare*, 878 F.2d 1145, 1155–56 (9th Cir. 1989)).

[67] *Tsao*, 698 F.3d at 1140.

[68] *Id.* at 1134.

[69] *Id.* at 1140.

[70] *Id.*

that training and authority when taking the plaintiff into custody,[71] the casino was a state actor and was therefore liable under § 1983.[72]

The record here falls far short of establishing that the defendants' actions were substantially and inextricably intertwined with Metro's. Unlike the *Tsao* guards, the SLS guards did not testify that they had SILA authority or that they relied on any such intertwined authority with Metro in continuing to detain Nannis. The defendants' decisions to apprehend Nannis on the casino floor and to continue detaining him in the holding room were made independently of Metro. The defendants initially called Metro because they thought Nannis had a weapon and posed a threat to public safety. Then "[t]he call changed from investigating a terror threat 'to doing what security would like done on their private property[,] and that is a trespass.'"[73] Plus the defendants were not alone in requesting Metro's presence: Nannis himself requested its involvement, too.[74]

One of the elements of the joint-action test is that the state must receive some benefit from allegedly unconstitutional conduct. That element is not met here. Nannis identifies no benefit that Metro received from assisting SLS to trespass Nannis. Metro officers responded to the casino when it appeared that Nannis still could have posed a threat to public safety. As one of the officers testified, police often help casinos to trespass individuals from their property. Nannis contends that the defendants could have issued him a trespass citation without Metro and that its involvement indicates the existence of a conspiracy.[75] He also argues that "there are a

---

[71] *Id.* at 1140–41.

[72] *Id.* at 1142.

[73] ECF No. 39 at ¶ 24 (citing ECF No. 39-1 at 42).

[74] ECF No. 39-1 at 4–5, 7.

[75] ECF No. 39 at 15–18.

number of policies and customs that converge to demonstrate that it is Defendant LVRH's 'state of mind' that caused the violation of [Nannis's] right to be free of unlawful seizure."[76]

But the record is devoid of evidence of a conspiracy or joint action. It shows only that the casino made the choice to trespass Nannis from the property independent from Metro and verbally issued the trespass warning before Metro's arrival.[77] And Nannis doesn't contend that the defendants relied on state-given authority in detaining him. Because Nannis has not established that the defendants were either state actors or acting under color of state law, he cannot prevail on this claim by summary judgment, so I need not—and do not—reach the remaining elements. I therefore deny Nannis's motion for summary judgment on his § 1983 claims against both the casino and Williams.

## III. Genuine issues of material fact preclude summary judgment on Nannis's false-imprisonment claim.

Nannis also seeks summary judgment on his false-imprisonment claim against the casino and Williams. It is well-settled in Nevada that "[f]alse imprisonment is a restraint of one's liberty without any sufficient cause therefor."[78] "Even if an arrest is made [according] to valid legal process and therefore unactionable, imprisonment following the arrest may under some circumstances become unlawful[,]" including a delay between the detention and release.[79] "The trier of fact should resolve the question of unnecessary delay whenever the facts are disputed. It

---

[76] *Id.* at 19.

[77] ECF No. 40 at 9:10–11.

[78] *Lerner Shops of Nev., Inc. v. Marin*, 423 P.2d 398, 400 (Nev. 1967) (citation omitted).

[79] *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1145 (Nev. 1983) (citation omitted).

becomes a question of law for the court only when all the facts are conceded or clearly established."[80]

Summary judgment is unavailable on this claim because there is a genuine issue of fact about whether the defendants held Nannis longer than they had cause to and thus whether he was falsely imprisoned.  Nevada Revised Statute (NRS) § 171.1235 allows gaming licensees to "take into custody and detain any person when . . . they have reasonable cause to believe the person detained has committed a felony, whether or not in the presence of such licensee or the licensee's officers, employees[,] or agents."[81]  Such detention must be conducted "in a reasonable manner, for a reasonable length of time[,] and solely for the purpose of notifying a peace officer."[82]  The element at issue here is the reasonableness of the length of Nannis's detention.  He contends that the defendants should have consulted with Pricer earlier so they could have determined that Nannis was not a threat.  Pricer's statement indicates it was signed at 9:00 AM—while Nannis was still in the holding room.[83]  In it, he wrote that "[a]t no point did [he] ever feel threatened" by Nannis.[84]  Williams testified at his deposition that he read Pricer's statement while Nannis was still in custody, but it is unclear exactly when he read it.[85]  If Williams read Pricer's statement and continued holding Nannis in handcuffs in the holding room, a reasonable jury

---

[80] *Id.* (citations omitted).

[81] Nev. Rev. Stat. § 171.1235(2).  There exists a genuine dispute of material fact about whether the defendants believed Nannis had committed a misdemeanor or a felony.  ECF No. 49 at 16; *compare* ECF No. 39-1 at 8 (internal SLS report alleging that Nannis committed a misdemeanor—assault) *with* ECF No. 47 at 2, 17 (alleging that Nannis committed a felony—a terrorist threat).

[82] Nev. Rev. Stat. § 171.1235(3).

[83] ECF No. 39-1 at 30.

[84] *Id.*

[85] *Id.* at 24.

could find that the defendants held Nannis longer than they should have.  Alternatively, if Williams read the statement and promptly released Nannis, a jury could find that the defendants held Nannis for a reasonable time.

There is also a disagreement over whether or not Nannis had a hotel room at the SLS[86] and, if he did, when that room was searched.  The defendants assert that Nannis had an assigned hotel room—and even provide the room number[87]—and that they searched it for explosives and other weapons while Nannis was still detained.  Because of Nannis's alleged statement that "if [he] wanted to, [he could] blow [them] up in seconds,"[88] the defendants believed that he could have an explosive device stored in a hotel room.  But they found nothing whatsoever in the hotel room.  If they continued to keep Nannis in custody despite those search results, a reasonable jury could find that the defendants held Nannis longer than permitted.  If instead the defendants detained Nannis only until the search of the hotel room turned up nothing, then a reasonable jury could find no harm.

In sum, the timing of both incidents—when Williams read Pricer's statement and when security finished searching the hotel room assigned to Nannis—is material to whether there was a delay in the defendants' release of Nannis.  Because the jury must resolve these questions of timing and reasonableness of delay, I deny summary judgment on the false-imprisonment claim.

---

[86] While detained, Nannis repeatedly insisted that he did not have a hotel room at SLS but acknowledged that Pricer had offered him a complimentary one.  *See* ECF No. 40 at 9:07–08, 9:27.

[87] ECF No. 47-1 at 8.

[88] ECF No. 39 at ¶ 9.

**IV.   Genuine disputes about whether Williams acted in self-defense and whether the defendants had cause to continue detaining Nannis in handcuffs preclude summary judgment on Nannis's battery claim.**

Nannis theorizes that the defendants committed battery against him both "[i]n grabbing, tackling, and handcuffing" him and in the "continued handcuffing" of him in the holding room after "the cessation of legal authority" to do so.[89]  With minimal analysis, he seeks summary judgment on his battery claim, arguing that although "any legal authority to hold [Nannis] in handcuffs or have others handcuff [him] on their behalf ended," he "continued to languish in manacles for an appreciable period of time."[90]  The defendants counter that because "Williams reasonably believed that he was about to be shot," he was justified in both apprehending Nannis and in continuing to keep Nannis in handcuffs until the investigation into Nannis was finished.[91]

To establish a battery claim in Nevada, the plaintiff must show "an intentional and offensive touching of a person who has not consented to the touching."[92]  No one disputes that those elements are met here, both for Nannis's initial apprehension and continued detention.  The question is whether the defendants were justified in initially apprehending Nannis and in continuing to detain him in handcuffs.  "Self-defense is justified when the defendant reasonably believes that he or she is about to be attacked.  The defendant need not believe that he or she is in danger of great bodily harm and need not wait to be attacked before engaging in self-defense."[93]

---

[89] ECF No. 1-3 at ¶¶ 38, 40.

[90] ECF No. 39 at 25.

[91] ECF No. 47 at 11.

[92] *Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct.*, 376 P.3d 167, 171 (Nev. 2016) (cleaned up).

[93] *Giordano v. Spencer*, 888 P.2d 915, 917 (Nev. 1995) (citations omitted).

Williams states in his declaration that he "reasonably believed that [he] was about to be attacked and that Nannis was about to injure the patrons, employees, and property of the SLS."[94] There is thus a genuine dispute of material fact about whether Williams could rely on self-defense—or some other rationale, such as NRS § 465.101, which governs casino security officers' ability to detain suspects with probable cause—in deciding to apprehend and detain Nannis. Viewed in the light most favorable to the defendants, the evidence could lead a reasonable factfinder to conclude that Williams acted in self defense and that the defendants are therefore not liable for battery.

As for the defendants' continued handcuffing of Nannis, there is a genuine dispute about when cause to hold Nannis ended. As discussed *supra*, it is unclear when Williams learned that pit-floor supervisor Pricer never felt threatened and when the security officers searched the hotel room assigned to Nannis.[95] The timing of both is material to determining whether the defendants held Nannis for an appropriate amount of time. Because a reasonable jury could conclude that the defendants held Nannis for a permissible amount of time, there are genuine issues of material fact about whether the defendants have viable affirmative defenses. So I deny summary judgment on Nannis's battery claim.

**V.    Nannis has not provided sufficiently compelling reasons to seal the excerpt of the security manual.**

Finally, Nannis moves to seal an excerpt of the security manual that outlines SLS's trespass procedures.[96] This document was previously subject to a state-court protective order,

---

[94] ECF No. 47-1 at 3.

[95] *See, e.g.*, ECF No. 39-1 at 5–7.

[96] ECF No. 43.

16

which I lifted as to security camera footage but not as to the manual excerpt.[97]  I instructed

Nannis to comply with the local rules and file a motion for leave to file the manual excerpt under

seal, which he did.[98]  Nannis explains that he filed the motion "[i]n an abundance of caution so as

to not publicly file material that should remain protected," but also notes that he "believes that

the exhibit may be unsealed at this time."[99]  The defendants urge me to seal the excerpt because

"disclosure could compromise information relating to [the casino's] security response times,

locations from where security respon[d], and the tactics and techniques employed by LVRH

security personnel."[100]

"The public has a 'general right to inspect and copy public records and documents

including judicial records and documents.'"[101]  "Although the common-law right of access is not

absolute, '[courts] start with a strong presumption in favor of access to court records.'"[102]  "A

party seeking to seal judicial records can overcome the strong presumption of access by

providing 'sufficiently compelling reasons' that override the public policies favoring

disclosure."[103]  "When ruling on a motion to seal court records, the district court must balance

the competing interests of the public and the party seeking to seal judicial records."[104]

---

[97] *See* ECF No. 34.

[98] ECF No. 41.

[99] *Id.* at 2.

[100] ECF No. 45 at 2.

[101] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commc'ns., Inc.*, 435 U.S. 589, 597 (1978)).

[102] *Id.* (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

[103] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[104] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).

1    The parties have not shown compelling reasons to seal this manual excerpt.  Although the

2  exhibit contains information about SLS's security procedures, it does not appear that public

3  disclosure of the information contained in the exhibit could potentially damage SLS's

4  procedures.  So I deny the motion to seal and order that Exhibit 11 (ECF No. 43) be unsealed.

5                                              **Conclusion**

6          IT IS THEREFORE ORDERED that the plaintiff's motion for partial summary judgment

7  **[ECF No. 39] is DENIED**.

8          IT IS FURTHER ORDERED that the plaintiff's motion for leave to file Exhibit 11 under

9  seal **[ECF No. 41] is DENIED**.  The Clerk of Court is directed to **UNSEAL that document**

10 **[ECF No. 43]**.

11         IT IS FURTHER ORDERED that he parties must file **a joint pretrial order by**

12 **February 26, 2022, that complies with Local Rule 16-4**.  When offering potential trial dates in

13 the joint order, the parties should consider dates in late summer.

14                                                          _____
                                                            U.S. District Judge Jennifer A. Dorsey
15                                                                    Dated: January 26, 2022

16

17

18

19

20

21

22

23